**NICHIA v. UNITED STATES.**

No. 7397.

Circuit Court of Appeals, Ninth Circuit.

Oct. 8, 1934.

George Grigsby, of Juneau, Alaska, and Robert W. Jennings, of Sacramento, Cal., for appellant.

Wm. A. Holzheimer, U. S. Atty., and Geo. W. Folta, Asst. U. S. Atty., both of Juneau, Alaska, for the United States.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

The appellant, hereinafter referred to as the defendant, was charged by indictment with murder in the first degree, and was convicted of manslaughter. The indictment charges that the defendant "did unlawfully, feloniously, purposely and of deliberate and premeditated malice, kill Ole Storset, by shooting him with a .38 caliber revolver." The homicide occurred at Yakutat, Alaska, in a two-room building used by defendant as a residence and store.

On October 6, 1933, Ole Storset, the deceased, by occupation a fisherman, while in a drunken condition, accompanied by three other fishermen and a native boy, entered said building and ordered four bottles of home-brew beer. At deceased's request, one bottle of beer was delivered by defendant to the native boy who had directed the deceased to defendant's place. Upon defendant's refusal to allow the beer to be drunk upon the premises, two of the men and the native boy left the premises. Deceased followed them to the door, and while standing there with one hand on the knob of the door, cursed defendant and said he would "come back and get her that night." Defendant replied, "You won't get me; get out." Defendant went into her bedroom, secured a revolver, and returned to the store. Deceased then advanced toward defendant, saying, "I'll fix you," when he was shot. Deceased's dying declaration was to the effect that he was unarmed; that while leaving the premises he kicked over a bucket of halibut; and that defendant shot him.

The defendant testified, among other things, that:

"He [Storset] was very drunk and abusive. The other two men were very drunk. He became abusive after the other two men had gone out. He didn't like it because I refused to let them drink there. He said he would fix me that night. He called me names. Names that are not very appropriate to state here. He called me a nigger wench. And a son of a bitch. Lots of other names and said he would get me. He called me names five or six times before he was shot. I told him to

get out. I was at the door when he said he would fix me that night. He had not started to go anywhere, he just had his hand on the door knob. After that he made a further threat to me. When he said he would get me that night I ordered him out. I ordered him out twice in fact, then he said I will get you. Then he kicked over the tub and started toward me. I was standing alongside the icebox just by the door, the entrance to the bedroom. He said he would get me, hit at me and kept advancing. I went into the bedroom. I was afraid and I—I picked up the gun. I just held it there and it went off. I did not consciously pull the trigger. I don't know what my state of mind was, I was afraid. * * * I did not intend to shoot at all. * * * I don't know what for, because I was afraid I guess. I had no reason to believe he had a gun. I didn't know what he had."

On cross-examination the witness said:

"I didn't do anything to shoot the gun. I didn't know the gun was going to shoot. I merely picked it up. I don't know how I held it. I don't know which way the gun was pointed. I just merely picked it up and it went off. I don't know what I intended to do when I went to that dresser drawer. I had no idea. I went in there and picked up this revolver and held it in my hands without knowing why I did it. I must have been standing some place in front of the dresser when I shot Storset. I could not show you in feet how far away he was. He was very near to the bedroom door, I know that. I know he was advancing. He was threatening to get me. He was still threatening to get me. He was very drunk. He could not walk too steady. I think he staggered somewhat. I don't know whether I could have pushed him over easily. All I know when I fired I know he was advancing. I don't know where his hands were, he had just struck at me."

There was other testimony in the case tending to corroborate in part, at least, defendant's testimony. Deceased was unarmed at the time.

Appellee contends that "appellant's defense was that the shooting was wholly accidental, and the record contains only the evidence which appellant thinks bears on the question of justifiable homicide. Notwithstanding the defense, the court instructed on justifiable homicide in all its phases and on excusable homicide."

Defendant's theory of the case is stated in the brief as follows:

"It will be perceived that the defense interposed by the defendant is a combination of the theory of accident and self-defense. The jury evidently repudiated the theory of accident. The court found it impossible to eliminate the theory of self-defense, as evidenced by the court's instructions, except in so far as the instructions complained of themselves eliminate the theory of self-defense. At any rate, the hostile demonstrations of the deceased frightened the defendant. According to her testimony, she seized the revolver presumptively for her protection, and discarding the theory of accident, must have used it for protection. Consequently, the case and the appeal turns on the question of self-defense and the law of self-defense."

The instructions of the court to the jury dealt at length with the law of excusable and justifiable homicide, to which instructions no exceptions were reserved. Among other things, the court said:

"That the killing of a human being is also justifiable when committed by any person, as follows: 'To prevent the commission of a felony upon such person, upon his or her husband, wife, parent, child, master, mistress, or servant.' "

After the jury had deliberated for several hours, they returned into court and requested "further instructions on the subject of what constitutes a felony"; and, as stated by defendant, "it is the instruction given at this stage of the proceedings which is the basis of the principal specification of error upon which defendant relies." After considerable colloquy between the court and one of the jurors, the court, addressing the jury, asked if there were any other matters about which the jury were in doubt, and one of them replied, "This particular one concerning which you have not yet given the instruction seems to be the snag that stopped our progress." The court: "Which is that?" The juror: "That is—just exactly what a felony is. I think the majority of the jurors do not know whether Ole Storset's actions amounted to a felony or misdemeanor, and those who think we do know don't feel like we should have to let them depend on our word for it." The court: "Very well. The jury may retire and I will prepare an additional instruction on that subject which I think will clear up any doubt."

Later the court instructed the jury as follows:

"In response to your request the court instructs you that, a felony, generally speaking, is an offense or crime which may be punished

by death or imprisonment for a term exceeding one year. It is a graver and more serious offense than a misdemeanor. In this connection I further instruct you that striking with the fists constitutes simple assault and battery and can never constitute a felony, unless death results; and I further instruct you that even if you find from the evidence beyond a reasonable doubt that Ole Storset, at the time he was shot, was threatening and advancing towards the defendant, but was unarmed, this would be a simple assault only and not a felony. You are, however, instructed and cautioned that this instruction and all of the other instructions are to be considered by you as a whole, and that you are not at liberty to single out this or any other instruction I have given you and consider it to the exclusion of all the other instructions."

Defendant noted an exception to the instruction so given, "on the ground that it fails to embrace the fear the defendant might have entertained as to what Ole Storset might do or what might be the result of his attack on the defendant, and is limited to what he had already done; and fails to call attention to her right to repel an attack in her own premises, and on the further ground that an assault with the fists resulting in great bodily harm, if severe enough, would amount to a felony."

■ Defendant thereupon offered a modifying instruction, as follows:

"And in this connection, as I have already instructed you, you are instructed that a person in their own premises is entitled to stand her ground when attacked, and if he or she has reasonable ground to fear either death or great bodily harm at the hands of her assailant, he or she is entitled to use whatever force is necessary, or would under the circumstances seem apparently necessary, to a reasonable person, to repel such attack."

This modifying instruction was rejected, and an exception noted.

There was no error in rejecting the said proposed instruction. It was not only covered in the general instructions given to the jury, but, when the jury returned for further instructions, the court specifically instructed them as follows:

"A person while on her own premises, who is without fault herself, is not obligated to retreat nor to consider whether she can safely retreat, but is entitled to stand her ground and meet any attack made upon her, in such a way and with such force as, under all the circumstances, she at the moment honestly believes, and has reasonable grounds to believe, is necessary to save her own life or to protect herself from great bodily harm."

It appears that the court read the latter instruction from the instructions given in the first instance, and, at the time of repeating the same, stated:

"I don't know just what the difficulty is concerning that, except a person on their own premises is entitled to stand their ground, ordinarily. Ordinarily in self-defense, if the assault had occurred in some public place or some place other than on the defendant's own premises the law requires the defendant to retreat as far as they safely can or as it appears to the defendant at the time that they can, but if the assault occurs on their own premises the law gives the defendant a right to stand her own ground and to repel the assault with any force necessary to protect herself either from death or great bodily harm. But that is as far as the law goes; the law does not give any person the right by reason of the fact they are attacked, irrespective of the attack, no matter how serious it may be, to slay another, but it does give a person the right to use such force in repelling any attack made on them as he thinks, as a reasonable man, is necessary."

Defendant relies upon two specifications of error: (1) The giving of the instruction defining a felony; (2) the refusal to give the above-quoted modifying instruction. We have already disposed of the latter specification.

■ We find no error in the court's instructions given in response to the jury's request. They substantially conform to section 184 and section 25 of the Alaska Penal Code, and are in accordance with general law. Those sections are as follows:

"Sec. 184. Division of crimes. That crimes are divided into felonies and misdemeanors. A felony is a crime punishable with death, or which is or may be punishable by imprisonment in the penitentiary. Every other crime is a misdemeanor."

"Sec. 25. Assault or assault and battery. That whoever, not being armed with a dangerous weapon, unlawfully assaults or threatens another in a menacing manner, or unlawfully strikes or wounds another, shall be fined not more than five hundred dollars or imprisoned in the county jail not more than six months, or both."

We think the court fairly and properly instructed the jury on all the issues raised in the case, and we see no valid reason for disturbing the verdict.

Judgment affirmed.